**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UBS FINANCIAL SERVICES, INC.,** | |
| **Plaintiff,** | **Case No. 1:22-cv-06917** |
| **vs.** | |
| **BRIAN KENNEY,** | |
| **Defendant.** | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BRIEF FACTUAL BACKGROUND......................................................................................... 4

    A.  UBS's ALFA Agreement Is Unenforceable Due to Lack of Consideration. .................. 4

    B.  Kenney Has Complied With The Terms Of The ALFA Agreement. ............................. 5

ARGUMENT .......................................................................................................................... 8

  A.  UBS Cannot Show that It Has A Reasonable Likelihood of Success on the Merits. ......... 8

  B.  UBS Cannot Show That It Does Not Have An Adequate Remedy At Law or That It Will Suffer Irreparable Harm If An Injunction Is Not Issued. ....................................................... 14

  C.  The Irreparable Harm That Will Result to Kenney if the TRO or Preliminary Injunction is Wrongfully Granted Outweighs the Harm UBS Will Endure if the TRO or Preliminary Injunction is Not Granted................................................................................................... 17

  D.  The Issuance of an Injunction is Contrary to the Public Interest...................................... 18

CONCLUSION....................................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Bank of Am. Inv. Servs. v. Byrd*, Civil Action No. 2:09cv211,

2009 U.S. Dist. LEXIS 133322 (E.D. Va. June 13, 2009) ........................................ 12

*Bankers Life & Cas. Co. v. Am. Senior Benefits LLC*,

    2017 IL App (1st) 160687 ...................................................................................... 4

*Barney v. Burrow*,

    558 F. Supp. 2d 1066 (E.D. Cal. 2008) ................................................................ 15

*Curtis 1000 v. Suess*,

    843 F. Supp. 441 (C.D. Ill. 1994) ......................................................................... 9

*Edward D. Jones & Co., L.P. v. Kerr*,

    415 F. Supp. 3d 861 (2019) ..................................................................... 11, 18, 19

*Ill. Republican Party v. Pritzker*,

    973 F.3d 760 (7th Cir. 2020) ................................................................................ 9

*J.P. Morgan Sec. LLC v. Shields, No. 118CV02788*,

    2018 WL 6426835 (S.D. Ind. Sept. 26, 2018) ...................................................... 12

*Carvalho v. Credit Suisse Secs. (USA) LLC, No. 1:07-CV-2612-RWS*,

    2007 U.S. Dist. LEXIS 80651 (N.D. Ga. Oct. 31, 2007) ...................................... 19

*Merrill Lynch, Pierce, Fenner & Smith v. Bennert*,
   980 F. Supp. 73 (D. Me. 1997) ............................................................ 16

*Merrill Lynch, Pierce, Fenner & Smith v. de Liniere*,
   572 F. Supp. 246 (N.D. Ga. 1983) .................................................. 16, 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*,
   839 F. Supp. 68 (D. Me. 1993) ............................................................ 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co.*,
   403 F. Supp. 336 (E.D. Mich. 1975) .................................................. 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*,
   194 F.R.D. 618 (N.D. Ill. 2000) ................................................ 6,13,14

*Regions Bank v. Raymond James & Assocs.*, No. 6:20-cv-658-Orl-40EJK,
   2020 U.S. Dist. LEXIS 221452 (M.D. Fla. May 15, 2020) ........................ 12, 18, 19

*Stanley DW, Inc. v. Frisby*
   163 F. Supp. 2d 1371 (N.D. Ga. 2001) .................................... 16, 18, 19

*Orr v. Shicker*,
   953 F.3d 490 (7th Cir. 2020) .......................................................... 8, 15

*Prudential Sec., Inc. v. Plunkett*,
   8 F. Supp. 2d 514 (E.D. Va. 1998) .................................................... 13

*Sampson v. Murray*,
   415 U.S. 61 (1974) .......................................................................... 15

*Somerset Place, LLC v. Sebelius*,
   684 F. Supp. 2d 1037 (N.D. Ill. 2010) ............................................. 14

*Torres v. Frias*,
   68 F.Supp.2d 935 (N.D. Ill. 1999) .................................................... 15

*Turnell v. Centimark Corp.*,
   796 F.3d 656 (7th Cir. 2015) ............................................................ 8

*UBS Fin. Servs. v. Christenson*, No. 13-1081 (MJD/JSM),
   2013 U.S. Dist. LEXIS 69067, at *14 (D. Minn. May 15, 2013) ............ 13

*Zellner v. Stephen D. Conrad, M.D., P.C.*,
   183 A.D.2d 250, 589 N.Y.S.2d 903 (App. Div. 2nd Dept. 1992) ........ 9,10

**RULES**

FINRA Rule 2140 ............................................................................ 13, 19

FINRA Rule 11870 ................................................................................ 13

Defendant Brian Kenney ("Kenney") respectfully submits this Memorandum of Law in Opposition to the Motion for Temporary Restraining Order and Preliminary Injunctive Relief (the "Motion") filed by Plaintiff UBS Financial Services, Inc. ("Plaintiff" or "UBS").

## PRELIMINARY STATEMENT

UBS engages in three grave, deceitful actions in this situation, first, alleging that Kenney received dozens of clients under UBS's ALFA Agreement, second, that Kenney's announcement to his clients that he changed firms breached the ALFA Agreement's non-solicitation provision and, third, using its sham ALFA Agreement as an excuse to defame Kenney by telling Kenney's clients that Kenney is robbing his former partner's widow of the benefits of the ALFA Agreement. The truth is that Kenney was free from a non-solicitation obligation, but participated in the ALFA Agreement to gratuitously, i.e., lacking in consideration, give his elderly partner and, thus, his partner's widow hundreds of thousands of dollars in survivor benefits. UBS uses this selfless generosity to attack Kenney.

UBS also falsely accuses Kenney, or his assistant Paula Romo, of taking UBS documents. These allegations are not accurate, and the allegations are refuted thoroughly in the Declarations of Brian Kenney and Paula Romo, which are attached hereto as Exhibits A and B respectively. Exhibit A (hereinafter "Kenney Decl."), ¶ 8; Exhibit B (hereinafter "Romo Decl."), ¶¶ 2-3.

This Court should deny UBS's request.

UBS offers its senior financial advisors the ability to get paid for transitioning their clients to a junior financial advisor when they retire in the form of a three-part agreement named the "ALFA Program," under which the senior financial advisor gets paid, the junior financial advisor receives clients he or she would not otherwise have and UBS retains financial advisors and clients.

UBS's Complaint and Motion for a Temporary Restraining Order ("TRO") forcefully assert that Kenney in fact was "introduced" to these clients under the ALFA Agreement. Charles Newman attests in his Declaration nine separate times that "…I learned that Client #[1-9] was a client who was introduced to Defendant via the ALFA Program." *See* Newman Decl., ¶¶ 12- 20. This is absolutely false. *See* Kenney Decl., ¶¶ 13-23.

Kenney was introduced to no clients whatsoever under the January 15, 2021 ALFA Agreement. *See id.* at ¶¶ 6, 13-15.

Instead, Kenney and his former partner, Leonard Kipnis, worked together at Morgan Stanley for years before joining UBS thirteen years ago in 2009. Kenney and Mr. Kipnis then jointly serviced clients for over ten years at UBS, i.e., since 2011. As Mr. Kipnis surpassed retirement age and entered his late 80's, he spent less time providing financial services to clients, and Kenney effectively became the exclusive financial advisor providing financial services to clients over the last few years. *See id.* at ¶¶ 4, 13.

At the end of 2020 and beginning of 2021, as Mr. Kipnis reached 90 years of age, the ALFA Program was described as a way for Mr. Kenney to *gratuitously,* i.e., without consideration, provide hundreds of thousands of dollars in payment to Mr. Kipnis or, should Mr. Kipnis pass away, for his widow, Phillis Kipnis. Critically (both on the legal merits and equities of UBS's claims), Kenney had no obligation to sign the ALFA Agreement. Kenney could have simply continued to service his entire client base after Mr. Kipnis ceased being a UBS employee and would have been free to solicit all of his clients should Kenney ever move to another firm.[1] *See id.* at ¶ 14.

---

[1] Kenny separately had a Deferred Cash Award Agreement containing a non-solicitation provision which provision was extinguished when Kenney made a certain payment to UBS, and which payment Kenney in fact made by wire within hours of UBS identifying the amount to be paid. *See* Kenney Decl., ¶ 19.

Thus, Kenney received zero consideration whatsoever from the ALFA Agreement (rendering the ALFA Agreement unenforceable), but he signed it anyway to pay Mr. Kipnis (or Mrs. Kipnis) hundreds of thousands of dollars and risk a non-solicitation provision. The ALFA Agreement was a total sham in which Kenney received only detriment and no consideration that Kenney agreed to out of pure generosity to Mr. and Mrs. Kipnis.

Kenney transitioned to Morgan Stanley on Friday, December 2, 2022 to better service his clients and, even though he had received no consideration under the ALFA Agreement, abided by its non-solicitation provision and only announced his new firm to his clients. Under the applicable law, an "announcement" is not a "solicitation." The Financial Industry Regulatory Authority ("FINRA"), which issues regulations applicable to UBS, has repeatedly made clear that when a financial advisor changes firms, it is the clients' interests which are of the utmost importance, explicitly including the ability to communicate with their financial advisor at a new firm about how to continue working with their trusted advisor. UBS knows this and will admit it if asked.

UBS immediately threatened to seek a TRO against Kenney to enforce the non-solicitation provision even though UBS knew Kenney had received no consideration, i.e., new clients or accounts, under the ALFA Agreement.

Kenney immediately made UBS aware of his intention to make sure Mrs. Kipnis received the payment she expected even though the ALFA Agreement was unenforceable. *See* Kenney Decl., ¶ 18.

Worst of all, UBS had one of its financial advisors, Charles Newman[2], call Kenney's clients and tell them that Kenney is taking money from Mrs. Kipnis, that Kenney is denying Mrs. Kipnis the benefit her husband left to her, that Morgan Stanley would ultimately fire Kenney and that Kenney will be thrown out of the industry. This is false and disgraceful. *See id.* at ¶ 28.

---

[2] Charles Newman signed one of the two Declarations filed by UBS in this case.

3

"Announcements" are not "solicitations" under Illinois law or the applicable regulations. The case of *Bankers Life & Cas. Co. v. Am. Senior Benefits LLC*, 2017 IL App (1st) 160687 definitively holds, on facts far closer than the ones in this case, that an announcement is not a solicitation. In *Banker Life* a former employee sent a targeted LinkedIn connection request to three former coworkers which, when accepted, led to an explicit written solicitation. The Court ruled that these communications were not solicitations because the connection request was not itself a solicitation, even though the coworkers' acceptance of the request led to an explicit solicitation and even though the former employee used this LinkedIn practice to solicit. *Id.*

UBS's Motion is unsupported by an enforceable agreement and unsupported by credible evidence of solicitation or of the taking of documents. Thus, UBS fails to carry its heavy burden needed to obtain the extraordinary relief of a TRO against Kenney. Moreover, an order enjoining Kenney from engaging in conduct in which he has not engaged is unnecessary and will only serve to assist UBS in deliberately damaging Kenney's reputation. UBS has filed a Statement of Claim in FINRA arbitration as it is required to do, and thus, has a remedy and can still seek damages in if it believes it has been harmed.

## BRIEF FACTUAL BACKGROUND

### A.    UBS's ALFA Agreement Is Unenforceable Due to Lack of Consideration.

UBS's ALFA Agreement is designed to facilitate a "Legacy Financial Advisor" with an established client base transitioning his or her clients to a "Receiving Financial Advisor" that the Receiving Financial Advisor would not otherwise have and compensating the Legacy Financial Advisor for doing so. In this case, the Legacy Financial Advisor, Leonard Kipnis, and the Receiving Financial Advisor, Kenney, had been jointly servicing a shared client base for over a decade, including in part at a firm prior to UBS. *See* Kenney Decl., ¶ 4. As Mr. Kipnis stepped back from actively servicing clients, Kenney began fully serving all of the clients and in most

instances, had been the clients' sole and exclusive contact for many years before the execution of the ALFA Agreement. *See* Kenney Decl., ¶¶ 13-14.

At the end of 2020 and beginning of 2021, as Mr. Kipnis approached 90 years of age, UBS suggested that Kenney agree to have a certain amount of his compensation siphoned off to pay Mr. Kipnis and, should Mr. Kipnis pass away, Mr. Kipnis' spouse Phillis Kipnis. While Kenney was willing to and is going to ensure Mrs. Kipnis received the payments she was expecting, UBS's use of its ALFA Agreement to accomplish this outcome was and is radically inappropriate.

The ALFA Agreement itself explicitly describes the consideration that Kenney, the "Receiving Financial Advisor," is supposed to receive under the said Agreement on page one: "Having decided to enter ALFA as a Receiving FA, you are at this point aware of the Financial advisor from whom the ALFA accounts will be transitioned… as of the Start Date…In this regard, you have committed to use your best efforts to ensure a successful transition of the ALFA Accounts from the Legacy FA…" Exhibit A to Plaintiff's Complaint. This never happened. No accounts or clients were transferred from Leonard Kipnis to Kenney that Kenney was not already serving.

### B.    Kenney Has Complied With The Terms Of The ALFA Agreement.

The ALFA Agreement contains a one-year non-solicitation provision. Mindful of his obligation not to solicit under this Agreement, Kenney made a simple announcement to some of the ALFA clients whom he had been servicing for over ten years. Kenney called clients that he serviced for many years and with whom he has a close personal relationship and conscientiously told them that he had joined Morgan Stanley and provided his new contact information. If, and only if, the client asked him for additional information, such as why he changed firms, what the client's options were and if and how the client could continue to work with him, he answered those questions. If a client asked to keep working with him, he assisted them in doing so.

5

Predictably, clients who have chosen to work with Kenney for over ten years in an extremely competitive environment, quickly expressed a desire to continue working with Kenney. See Kenney Decl., ¶ 29. The purpose of this announcement was to notify clients of his change of employment. Kenney made certain not to solicit these clients to transfer their accounts to Morgan Stanley. *See id.* at ¶ 7.

UBS's Motion for a TRO explicitly states that Kenney solicited clients and relies on the Declaration of Charles Newman as its only supporting evidence. This effort fails, first, because Newman was not present for any of the conversations he attests to and, second, because even some Newman's descriptions of the conversations he was not present for do not evidence solicitation, e.g., "[Kenney] already scheduled a meeting with her…" (Newman Decl., ¶ 13), "…that [Kenney] informed her about his move to Morgan Stanley…" *Id.* at ¶ 17.

Brian Kenney was present for every conversation at issue and addresses each of the clients addressed in Newman's Declaration with specificity.

Kenney did not receive any clients under the ALFA Agreement as Kenney already had longstanding personal relationships with these clients. In his Declaration, Kenney provides detailed explanations for each of the clients UBS alleges he inherited under the ALFA Agreement and makes clear that the clients UBS points to have close relationships with Kenney. *See* Kenney Decl., ¶¶ 20-27. This Court has stated that these longstanding personal relationships make it "inconceivable" that clients would not follow a departing financial advisor to his new employment. *See Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 620 (N.D. Ill. 2000) (where the departing advisor had personal relationships with his clients beyond his employment with Merrill Lynch "…it is ***inconceivable*** that such close friends and high school 'chums' would not follow O'Connor to his new employment, or that they would be likely

to stay with Merrill Lynch if O'Connor were to be enjoined from doing business with them.")
(emphasis in original).

UBS's allegations regarding client referrals under the ALFA program are not accurate. Not
only did Kenney not solicit clients, but the clients were clients he serviced well before the execution
of the ALFA program.  Kenney's goal was to provide for his partner's widow, but UBS did not
provide him any benefit or consideration under the ALFA program.

UBS makes the gravely serious allegation that Kenney and/or his assistant Paula Romo
misappropriated UBS's trade secrets.

First, as the Declarations of Kenney and Romo attest, neither Kenney nor Romo took or
retained any printed documents, took or retained any UBS client information or have used
information taken from UBS since their resignations. *See id.* at ¶ 8; *see also* Romo Decl., ¶¶ 3-4.

Second, the "evidence" provided to this Court by UBS collapses under the slightest scrutiny.
UBS's allegations of misappropriation are supported by a mere six sentences in the Declaration of
Craig E. Tomasino, specifically:

"[Kenney] engaged in an uncharacteristically large amount of printing in the weeks leading up
to his resignation." Tomasino Decl., ¶ 50.

"[Kenney] printed a large number of documents on November 17 (two weeks before his
resignation). On information and belief following a review of the print logs the print job on
November 17 totaled roughly 200 pages and included confidential client information." *Id.*

"…on November 29, 2022 (three days before their resignation), Romo printed spreadsheets at
the UBS branch office. On information and belief, the spreadsheets printed by Romo contained
confidential client information." *Id.* at ¶ 51.

"…on the morning of her resignation on December 2, Romo printed 80 pages worth of documents." *Id.* at ¶ 52.

Notably, Romo worked as an assistant for three financial advisors, Brian Kenney, Charles Newman and Peter Degroot, and she routinely printed documents to assist them as part of her job responsibilities. *See* Romo Decl., ¶ 2.

## <u>ARGUMENT</u>

UBS cannot satisfy the prerequisites for the extraordinary remedy of injunctive relief. For a preliminary injunction or a temporary restraining order to be warranted, UBS must first demonstrate: (1) that it will suffer irreparable harm in the absence of a preliminary injunction, (2) that it has no adequate remedy at law, and (3) that it has a reasonable likelihood of success on the merits. *Turnell v. Centimark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). If UBS fails to make this showing, the inquiry ends. *See id.* However, if the Court finds UBS has made such a showing, this Court must then consider whether "the irreparable harm [UBS] will endure if the preliminary injunction is wrongfully denied [outweighs] the irreparable harm to [Kenney] if it is wrongfully granted" and the effect of granting or denying the preliminary injunction on the public. *Id.* UBS must show a "clear need" to obtain such an exceptional remedy. *Id.* "A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (internal quotations and citations omitted). UBS cannot and has not met the high standard needed for this Court to grant injunctive relief.

### A.   <u>UBS Cannot Show that It Has A Reasonable Likelihood of Success on the Merits.</u>

As stated in UBS's Memorandum of Law in Support of Its Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("Plaintiff's Brief"), while UBS does not

need to show it will win the case, it must make a strong showing that it has a reasonable likelihood of success on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). In cases involving restrictive covenants, preliminary injunctions "will not be granted unless there is an extreme emergency and the threat of serious harm that would result in the absence of an injunction." *Curtis 1000 v. Suess*, 843 F. Supp. 441, 445 (C.D. Ill. 1994). All of UBS's claims fail as they are premised on two theories: (1) that there was a valid contract between UBS and Kenney; and (2) that Kenney solicited clients. As demonstrated below, these allegations do not rise to the level necessary to show a reasonable likelihood of success on the merits, and therefore, this Court should deny UBS's motion.

UBS claims that New York law applies to both the ALFA Agreement and the Deferred Cash Agreement as both have New York choice of law provisions. *See* Plaintiff's Brief at 12, fn 3. However, Defendant disagrees with this assessment. Courts in Illinois will uphold choice of law provisions subject to two limitations. *Curtis,* 843 F. Supp. at 445. The first limitation to giving effect to choice of law provisions is "where it is [] dangerous, inconvenient, immoral, [or] contrary to the public policy of the local government." *Id.* (internal quotations and citation omitted). The second limitation is where there is not "some relationship between the chosen forum and the parties or the transaction." *Id.* (internal quotations and citation omitted). Here, the choice of law provisions within the contracts should not be honored because New York's law regarding restrictive covenants is contrary to Illinois public policy, and there is no relationship between the chosen forum and the parties or the transaction.

Under New York law, continued employment is adequate consideration for restrictive covenants signed during an employee's employment. *Zellner v. Stephen D. Conrad, M.D., P.C.*, 183 A.D.2d 250, 256, 589 N.Y.S.2d 903, 907 (App. Div. 2nd Dept. 1992). While this is

consistent with Illinois law, the difference lies in the duration of employment sufficient to be considered "consideration." Illinois courts have repeatedly held that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant. *Fifield v. Premier Dealer Servs.*, 2013 IL App (1st) 120327, ¶ 19, 373 Ill. Dec. 379, 384, 993 N.E.2d 938, 943. New York law has not set a specific duration and instead states where "…a relationship continues for a substantial period after the covenant is given, the forbearance is real, not illusory, and the consideration given for the promise is validated." *Zellner*, 589 N.Y.S.2d at 907 (finding five years to be a "substantial period"). "Admittedly, New York courts have not established a lower boundary for what time period constitutes a 'substantial period' of employment. Courts have held under New York law that five and a half years, and slightly over two years, were 'substantial periods' of employment." *Stanacard, LLC v. Rubard, LLC*, 2016 U.S. Dist. LEXIS 15721, at *33 (S.D.N.Y. Feb. 3, 2016) (internal citations omitted). Furthermore, under New York law, this "substantial period" requirement does not apply where the employee resigns. *See id.* at *30 ("[The fact that the Defendant resigned his employment] estops him from arguing that the term of his continued affiliation with the company…was too short."). Illinois courts apply the two year minimum even where the employee resigns. *Fifield*, 993 N.E.2d at 943.

There is also not a relationship between New York and the partis to this transaction. As UBS admits, Kenney worked as a financial advisor in its Chicago, Illinois office. Plaintiff's Brief at 1. Any alleged actions complained of by UBS occurred in Illinois. Moreover, UBS is incorporated in Delaware, its main office is in New Jersey, and its mailing address is in Tennessee. *See* UBS's BrokerCheck Report, attached hereto as Exhibit C. While UBS may have

an office in New York, this is not sufficient to create some sort of relationship between New York and the parties to the transaction.

Here, we have a consideration issue because UBS has presented no credible evidence that Kenney received consideration under the ALFA Agreement. First, while UBS continually refers to the ALFA agreement as the "2020 ALFA Agreement," it was not signed until January 15, 2021. *See* Plaintiff's Brief at 3. Thus, Kenney's employment duration is short of the two years identified by Illinois courts as being sufficient consideration. Second, Kenney disputes that he inherited any clients under the ALFA Agreement. *See* Kenney Decl., ¶ 6. Without any consideration, this Agreement cannot be enforced. Furthermore, Kenney disputes that he solicited any clients allegedly subject to the ALFA Agreement in violation of said Agreement with UBS. *See id.,* ¶ 7. Kenney merely informed some of his clients that he had left UBS and joined Morgan Stanley as a personal and professional courtesy, after having worked with these clients for many years. This was an announcement—not a solicitation.

In another case brought by a broker-dealer and FINRA member firm, like UBS, the Court rejected arguments that an announcement constituted a solicitation under Missouri law. In *Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873 (2019), the Court found that "Mr. Kerr's announcement does not qualify as a solicitation where there is no evidence to show that Mr. Kerr did anything but inform his former clients of his new employment. Nor is there evidence that he wrongfully appropriated Edward Jones's information to generate these notices." *Id*. at 874. Rather, the Court found

> no evidence before us contradicts Mr. Kerr's stated purpose [to inform his former clients of material changes to their accounts following his departure from Edward Jones] that Mr. Kerr made no further contact with his former clients after this initial notification of his departure and that he never provided any information about [his new employer] unless his clients initiated such a discussion or explicitly requested more information all substantiate Mr. Kerr's claim.

*Id*. at 875. As such, "Edward Jones's argument in favor of labeling Mr. Kerr's announcements to his former clients as impermissible solicitations is factually and legally unavailing." *Id*. at 874. Furthermore, the Court recognized that announcing was not limited to Missouri law: "Our own research reveals that the majority of courts [ ] analyzing this issue within the context of the financial broker/dealer industry reject the theory that an 'announcement,' like Mr. Kerr's, qualifies as a solicitation, even where an employment agreement prohibits both indirect as well as direct solicitations." *Id*. at 873.

Likewise, in *J.P Morgan Securities, LLC v. Shields*, the Court declined to enter a TRO where the advisors "admit[ted] to having recalled client names from their own memories and using publicly available information to inform those former clients of their new [employment]." *J.P. Morgan Sec. LLC v. Shields*, No. 1:18-cv-02788-SEB-MJD, 2018 U.S. Dist. LEXIS 211255, at *3 (S.D. Ind. Sep. 26, 2018). While the Court ultimately entered a preliminary injunction, it did so because J.P. Morgan had developed evidence that the advisors were engaged in conduct that went beyond announcing. UBS has not established similar proof on this record; therefore, similarly, a TRO should be denied.

Indeed, other courts deciding this issue have held that announcing a change of employment is permissible in the financial services industry. *See, e.g., Bank of Am. Inv. Servs., Inc. v. Byrd*, 2:09-CV-211, -212, 2009 WL 10184606 (E.D. Va. June 15, 2009) (the plaintiff did not show a reasonable likelihood of success on the merits when brokers called clients to inform them of their departure and provide new contact information); *Regions Bank v. Raymond James & Assocs.*, No. 6:20-cv-658-Orl-40EJK, 2020 U.S. Dist. LEXIS 221452, at *10 (M.D. Fla. May 15, 2020) ("Defendants produced unrefuted testimony that finance industry standards permit an announcement, either written or telephonic, following an employee's departure for another firm.

12

Without making an ultimate determination on the issue, the Court believes that a phone call notifying former clients of a departure is unlikely to constitute a per se solicitation."); *UBS Fin. Servs. v. Christenson*, No. 13-1081 (MJD/JSM), 2013 U.S. Dist. LEXIS 69067, at \*14 (D. Minn. May 15, 2013) (finding that "a neutral announcement of [Defendant's] new employer and contact information to the former clients with whom [Defendant] worked . . . is permissible and reasonable").

Nothing in the agreements sought to be enforced by UBS explicitly prohibits announcing. Further, upon information and belief, UBS allows its own newly-hired advisors to announce that they joined UBS, even when the advisors are subject to non-solicitation agreements with other firms. Indeed, FINRA Rule 2140[3] prohibits interfering with a client's request to transfer his/her account and embodies the policy of honoring a client's decision to choose his/her financial advisor. In this same spirit, this Court stated in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 620 (N.D. Ill. 2000) that "[i]t would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit [its former employee] from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him." Additionally, courts have noted the relationship between a broker and his clients is a deeply personal relationship. *See Prudential Sec., Inc. v. Plunkett*, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998) (stating that "[a] broker-client relationship, like a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust. Clients should be free to deal with the broker of their choosing and

---

[3]No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account. Nothing in this Rule shall affect the operation of Rule 11870.

not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover.").

In light of the case law and the industry standard on this point, surely UBS does not seek to prohibit announcing in this case and seeks solely to prohibit solicitation – and only as it relates to clients subject to certain agreements. To seek a prohibition on announcing would be "indicia of bad faith" on the part of UBS. *See Merrill Lynch v. O'Connor*, 194 F.R.D. at 619. On this point, UBS has not presented credible evidence establishing that Kenney did anything more than announce to the clients subject to these agreements. The mere fact that Kenney communicated with the clients is insufficient. After simply announcing, the client is entitled to request more information, to request a meeting or to request to transfer their account—none of which UBS can prohibit from happening.

Likewise, UBS's references to alleged pre-resignation conduct and communications fail to establish any solicitation of clients after Defendants left UBS. If UBS believes that pre-resignation conduct entitles it to damages, then it can seek such damages in the FINRA arbitration. However, for purposes of this Motion, UBS's allegations regarding pre-resignation conduct do not establish that there is any continuing harm that requires this Court to intervene and prohibit the same from occurring.

Accordingly, UBS has not met its burden of showing that it has a reasonable likelihood of success on the merits of its claims against Kenney.

**B.**     <u>**UBS Cannot Show That It Does Not Have An Adequate Remedy At Law or That It Will Suffer Irreparable Harm If An Injunction Is Not Issued.**</u>

The requirements of irreparable harm and no adequate remedy at law "tend to merge." *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1042 (N.D. Ill. 2010). In Illinois, an injunction "will not be issued when the plaintiff has an adequate remedy at law." *Torres v.*

*Frias*, 68 F.Supp.2d 935, 942 (N.D. Ill. 1999). Further, an injury is not irreparable if money damages will adequately compensate the injured party. *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020). Where money damages provide an adequate remedy, the United States Supreme Court has held that irreparable harm cannot be demonstrated. *See Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) ("The *possibility* that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, *weighs heavily against a claim of irreparable harm*." (emphasis added)). The focus here is on the word irreparable. *Id.* Here, UBS cannot show that if it were to succeed on the merits, it will experience harm that is irreparable. In fact, it has shown that the harm is calculable by stating the amount of client assets Kenney was responsible for, the amount of revenue he generated for UBS, and the amount of revenue generated from the clients allegedly subject to the ALFA Agreement. Plaintiff's Brief at 2 and 9.

Over the past three decades courts have repeatedly held that the types of damages suffered by brokerage firms when they lose a broker are economic in nature, and even the possible difficulty in computation of such damages does not support a finding of irreparable harm. *See Barney v. Burrow*, 558 F. Supp. 2d 1066, 1083 (E.D. Cal. 2008) ("Courts have become disinclined to find irreparable, incalculable harm from financial advisors' departures."). When considering a brokerage firm's lost profits as evidence of irreparable harm, the court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co.*, 403 F. Supp. 336, 344 (E.D. Mich. 1975) stated the firm had "adequate legal recourse" and that the firm's "claim that the loss of primary commissions is unascertainable is conclusory and does not comport with prevailing concepts of damages." In another case involving a brokerage firm, the court expressly rejected the argument that a brokerage firm suffers anything other than economic loss when a departing broker seeks to solicit and service his clients. *Merrill Lynch, Pierce, Fenner & Smith v. de*

*Liniere*, 572 F. Supp. 246, 248-9 (N.D. Ga. 1983). When assessing the issue of irreparable injury, the court found

> . . . any loss of business to Merrill Lynch may be adequately redressed with money damages for breach of contract. The only possibly irreparable result would be some vaguely defined loss of business momentum, but the Court finds that to be unrealistic in the securities field. The real loss is in commission revenue generated by Mr. de Liniere from former Merrill Lynch customers, and that can be readily calculated from the commissions he and his new firm derive from the old Merrill Lynch customers. As a result, there will be no injury to the movant that cannot be remedied later.

*Id.* at 249. Courts continually find that the availability of money damages contravenes the irreparable injury element necessary to receive a preliminary injunction, and speculation regarding the difficulty of calculating damages is not sufficient to support a preliminary injunction. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74 (D. Me. 1993).

UBS fails to show why Kenney's alleged actions would result in irreparable harm. UBS can easily track the amount of assets the clients had under management and calculate the revenue it received from clients over a specific time period, which it has demonstrated in its brief. UBS can present this evidence in the FINRA arbitration to support its damages claims. On this point, in denying a motion for a TRO, the Northern District of Georgia in *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375-76 (N.D. Ga. 2001) explained:

> [t]he securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from Morgan Stanley is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants. . .doing business with those customers that Morgan Stanley considers its own can be traced precisely. Any loss Morgan Stanley might suffer as a result of Defendants' departure is calculable.[4]

---

[4] *See also, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Bennert*, 980 F. Supp. 73, 75 (D. Me. 1997) (damages caused by the departure of brokers to a competing firm could be calculated by reference to past earnings and expert testimony).

When considering the case law regarding the transition of financial advisors among brokerage firms and UBS's arguments, UBS cannot demonstrate irreparable harm. Here, any alleged harm would be compensable through money damages, which precludes UBS's request for injunctive relief.

**C. The Irreparable Harm That Will Result to Kenney if the TRO or Preliminary Injunction is Wrongfully Granted Outweighs the Harm UBS Will Endure if the TRO or Preliminary Injunction is Not Granted.**

The balancing of the equities – far from tipping in UBS's favor – clearly favors denying UBS's request for a temporary restraining order or preliminary injunction. Kenney's commissions for the past 12 months represents an infinitesimal portion of UBS's revenue, and UBS cannot honestly contend that Kenney's departure will impact it in any material way. If clients choose to do business with UBS, they are free to do so. The United States District Court for the Northern District of Georgia addressed this issue in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. De Liniere*, 572 F. Supp. 246 (N.D. Ga. 1983):

> If an injunction is granted, Mr. de Liniere may be prevented from serving the customers for whom he has worked over the last two years. It would leave him with no client base in a business that thrives on commissions from regular clients. If an injunction were to issue, damage to Mr. de Liniere while he waited ultimately to prevail would be catastrophic as a result of the loss of the income. Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on Mr. de Liniere than [JP Morgan], that disparity of effect supports denial of an injunction.

*de Liniere*, 572 F. Supp. at 249.

Even worse, here, UBS is already attempting to destroy Kenney's reputation with his clients. UBS is telling clients that Kenney is hurting his former partner's widow and violating his legal obligations to the widow and to UBS. There is no doubt that UBS would use an injunction to further attack Kenney's character. Because UBS cannot demonstrate any immediate and

17

irreparable harm, it cannot show that the harm associated with failing to provide a temporary restraining order will outweigh the harm to Kenney. The proposed temporary restraining order will affect Kenney's reputation and ability to fairly compete in the industry.

As UBS is aware, the entry of a TRO will be highly publicized, and will impact Kenney's reputation as an advisor in a highly regulated industry where reputation is critical. News outlets like AdvisorHub follow court and arbitration actions related to transitions like the present case. UBS has already used the fact that it is suing Kenney against him to suggest that Kenney committed wrongful acts, which he did not, and which will ultimately be decided by a FINRA Panel. "Brokerage firms can survive the denial of an injunction far more readily than their departing employees can survive its issuance." *Frisby*, *supra*, 163 F. Supp. 2d at 1381. As the Court in *Regions Bank* stated: "the issuance of a preliminary injunction will impose extreme costs on Defendants—most significantly in the form of reputational injuries. The Court hesitates to brand Defendants with an insinuation of wrongdoing without more definitive evidence to that effect." *Regions Bank*, *supra*, 6:20-cv-658-Orl-40EJK, 2020 U.S. Dist. LEXIS 221452, at *13.

If this Court deprives Kenney of contact with his respective clients, it could destroy the client relationships that Kenney has worked so hard to build. As stated above, announcing new employment does not constitute an unlawful solicitation. *Kerr*, 415 F. Supp. 3d at 873. UBS on the other hand, cannot demonstrate any effect that Kenney's departure will have on its business. When balancing the equities, the scale tips in Kenney's favor.

### D.     <u>The Issuance of an Injunction is Contrary to the Public Interest.</u>

A temporary restraining order will interfere with the rights of innocent third parties – Kenney's clients – to do business with their broker of choice. Preserving a customer's freedom of choice in the context of financial services is important. The court's opinion in *Frisby* is again

18

persuasive:

> the broker-client relationship was similar to that of attorney-client or doctor-patient. Personal trust and confidence pervades each of these relationships, and clients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent. . .The public has little interest in having its choice restricted to brokers *other* than the one who has served them, pending the resolution of this dispute. . .In a time of market volatility, the inability of a client to consult a trusted advisor for even a single day could result in enormous financial losses to the client. This danger outweighs any injury to the Plaintiff that may occur due to the disloyalty of its former employees. Issuance of a temporary restraining order in this case is not in the public interest.

*Frisby*, *supra*, 163 F. Supp. 2d at 1382 (internal quotations and citations omitted).

Similarly, in *Carvalho v. Credit Suisse Sec. (USA) LLC*, No. 1:07-CV-2612-RWS, 2007 U.S. Dist. LEXIS 80651, at *6 (N.D. Ga. Oct. 31, 2007), the Court noted that "[t]he public interest weighs in favor of allowing investors to maintain relationships with advisors in whom they have confidence. Investors should not be hampered in their investment decisions by employment disputes between firms and employees." Furthermore, in *Regions Bank*, *supra*, 6:20-cv-658-Orl-40EJK, 2020 U.S. Dist. LEXIS 221452, at *13, the Court stated:

> Moreover, courts are reluctant to restrict communications between financial advisors and their clients. *See Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 876 (S.D. Ind. 2019) (collecting cases). In a time of market volatility, a client's inability to consult a trusted advisor could result in enormous financial losses. This danger outweighs any injury Plaintiff might suffer due to the disloyalty of two former employees. Thus, issuance of a preliminary injunction could actively obstruct the public interest.

Clients have the right to work with the advisor of their choosing and their rights cannot be restricted by UBS attempting to prevent them from transferring their accounts to Kenney. *See* FINRA Rule 2140, fn 4 at pp. 11-12, *supra*. This includes engaging in conduct to facilitate a transfer, including requesting information or requesting a meeting. As discussed above, Kenney has only made a simple announcement and has otherwise responded to client inquiries. There

never has been, and still is not, any emergency warranting a TRO or evidence of any improper conduct.

## <u>CONCLUSION</u>

Based on the foregoing, Kenney respectfully requests that the Court deny UBS's Motion for Temporary Restraining Order and Preliminary Injunctive Relief.

Respectfully submitted, this 14th day of December, 2022.

**Gregory, Doyle, Calhoun & Rogers, LLC**
*/s/ Joseph B. Alonso (pro hac vice)*
49 Atlanta Street
Marietta, GA 30060
(770) 422-1776
jalonso@gdcrlaw.com
*Attorney for Defendant*

20